IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CLIFTON JAMES TERRELL, JR., ) No. C 07-1457 SBA (pr)
       Petitioner, )
v. ) **ORDER DENYING PETITION FOR**
) **WRIT OF HABEAS CORPUS**
D.L. RUNNELS, )
       Respondent. )

## INTRODUCTION

This matter is now before the Court for consideration of Petitioner's pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2005 conviction in San Francisco County Superior Court. Respondent D.L. Runnels, Warden of Pelican Bay State Prison, opposes the petition. Petitioner filed a traverse. For the reasons discussed below, the petition is DENIED.

## BACKGROUND

### I.   Case History

Petitioner was charged in San Francisco County Superior Court of first degree murder, attempted robbery and five counts of robbery (Cal. Pen. Code §§ 187, 212.5(c), 664.) The prosecutor also alleged sentence enhancements for Petitioner's use of a firearm and for committing the murder during the commission of attempted robbery. (Cal. Pen. Code §§ 190.2(a)(17), 12022.53(b),(d).) On March 2, 2005, the jury found Petitioner guilty of the murder and attempted robbery of Hunter McPherson and the robbery of Alexa Savelle, found true the enhancement allegations as to these charges, and found Petitioner not guilty of the robbery of Jeremy Molinaro and Davida Froehlich. The next day, the trial court declared a mistrial as to the remaining charges of robbery of Wen He and Zhao Li. The trial court sentenced Petitioner to a term of life in state prison without the possibility of parole and a consecutive term of 25 years in state prison.[1]

---

[1] Petitioner's co-defendant, Dwayne Reed, was charged with many of the same counts and allegations, as well as enhancements for prior strike convictions and prison terms. Reed pled guilty to accessory after the murder, one count of grand theft, and one count of robbery pursuant to an agreement conditioned upon his truthful testimony against Petitioner at trial.

The California Court of Appeal affirmed the conviction and sentence in published opinion on August 8, 2006, see People v. Terrell, 141 Cal. App. 4th 1371 (2006). (Resp't Ex. F.) Petitioner filed a petition for review in the California Supreme Court which was denied on November 29, 2006. (Resp't Ex. J.) Petitioner filed the instant petition on March 13, 2007, setting forth three claims. The Court issued an order to show cause on August 3, 2007. Respondent filed an Answer and Memorandum of Points and Authorities in Support of Answer to Petition for Writ of Habeas Corpus on December 3, 2007. On March 12, 2008, Petitioner filed a motion to stay the petition in order to exhaust the second and third claims. On July 7, 2008, the court dismissed claims two and three for failing to state a cognizable basis for federal habeas relief and denied Petitioner's request for a stay as unnecessary. Thereafter, on July 31, 2008, Petitioner filed a traverse. As his sole remaining claim herein, Petitioner asserts that admitting inculpatory statements he made to family members violated his constitutional rights because these statements were obtained by the police as the "fruit" of Petitioner's earlier confession that had been obtained unlawfully. This claim has been fully briefed and is now ready for review on the merits.

## II.  Statement of Facts

The following factual background is drawn from the California Court of Appeal opinion:

### A.  Prosecution Case

. . .

#### 3.  McPherson/Savelle Robbery and Murder

Sometime between 1:30 a.m. and 2:00 a.m. on November 17, 2001, Alexa Savelle and Hunter McPherson left a friend's house to walk the four or five blocks home to their Potrero Hill apartment. As they walked on Mariposa Street, a man approached from behind and asked McPherson for his wallet. When they turned around, Savelle saw a man with a gun standing about three or four feet away. He said to McPherson, "Give me your fucking wallet," and extended his arm with the gun pointed at McPherson's chest. McPherson said, "No." When the man repeated his demand, McPherson again said, "No." Savelle was not sure if the gunman asked McPherson for his wallet a third time. After demanding McPherson's wallet two or three times, the gunman turned to Savelle and asked for her purse while pointing the gun toward her chest. Savelle held her purse out and the man grabbed it out of her hand. The gunman turned back to McPherson and again asked McPherson for his wallet a couple of times, while pointing the gun at him, and McPherson refused each time. Neither Savelle nor McPherson said anything else to the gunman or made any move toward him. After McPherson's final refusal, the man shot him in the chest and fled. McPherson fell to the ground. After speaking to McPherson momentarily,

Savelle ran to a nearby residence to ask that someone call 911. McPherson died at 5:30 a.m. at San Francisco General Hospital. The cause of death was hemorrhagic shock due to the gunshot wound in the chest.

The police found no bullet or casing at the scene. A bullet was recovered from McPherson's body. Based on an examination of McPherson's body and clothing he was wearing at the time of the shooting, the medical examiner concluded that the bullet was not fired at close range. There was no evidence of gunshot residue on McPherson's hands.

Savelle described the gunman as 5 feet 11 inches, 170 to 180 pounds, medium build, dark brown hair, brown eyes, darker skin, possibly wearing a mustache, but no other facial hair. She thought the man was "possibly Hispanic" or "African-American/Hispanic." Savelle had worked with a police artist on November 17 to produce a sketch of the gunman. At trial, Savelle compared the artist's sketch to photos of defendant and Reed. She thought the sketch looked more like the photo of defendant. The gunman's hairstyle, skin tone, apparent age, and facial hair were all similar to defendant's, as depicted in the photo.

4.  Defendant's Confession and Telephonic Statements

On November 28, 2001, Inspector Thomas Cleary interviewed Reed in the police homicide office. Reed said he drove the getaway car to and from the crimes against McPherson and Savelle. The next day, Reed told Cleary that he was also involved in the robbery of an Asian couple near Pier 39 and of a Caucasian couple at Eighth and Townsend in the early morning of November 17.

After Reed's interview, defendant was brought to the same interview room later on the evening of November 28, 2001. The room was equipped with a hidden video camera and microphone. The police questioned defendant for about one and one-half hours. After first refusing to answer questions, defendant eventually admitted to his involvement in a robbery and shooting on Mariposa Street. He told police that he was driving down the street, saw a couple walking past, and got out and demanded their money. The man showed no fear of the gun, causing defendant to be afraid. When defendant snatched the woman's purse, the man ran up to him and grabbed the gun, causing it to fire. Defendant stated repeatedly that he did not mean to kill the man. Defendant admitted that he also committed a robbery at the "Wharf" and another robbery across from the Sega Center shortly before the shooting on Potrero Hill. When the interviewers told defendant that Reed had already admitted his involvement, defendant twice described how he and Reed drove around San Francisco and committed the robberies.

At the conclusion of the interview, defendant asked if he could call his mother. The officers agreed to get a telephone for him. When defendant dialed the number of his mother, the officers left the room and closed the door. One of the officers went to turn the recording equipment off when he left the room but, after hearing some of defendant's statements on the telephone, he changed his mind and continued to record defendant's conversations.

Defendant spoke to four family members, starting with his mother. He stated during the calls that he accidentally shot and killed "the Senator's son" while trying

3

to rob him.[2] He repeated several times that somebody had "snitched" on him and described how the shooting occurred as follows: "I tried to rob him and he wasn't going for it, so I was ready to run from him, so then I snatched his girlfriend [*sic*] purse. I was about to run, I'm backing up and he tried to rush me and he grabbed the gun and it went off. I didn't mean to kill him. I didn't." Defendant was highly emotional during the call, sobbing at times, professing his love for his family, and telling his mother that he was sorry for not listening to her.

. . .

B.   Defense Case

Defendant testified in his own defense. He turned 18 less than a month before the McPherson murder. His mother is "Mexican and Indian," and his father is Black.

By mid-November 2001, defendant was using seven to ten ecstasy pills a day, as well as smoking marijuana and drinking. On November 16, he had been up for three days and had eaten only candy and junk food during that time. That night, defendant and two other friends, Mister Allen and Bernard Hayes, went with Reed to find some ecstasy. After buying the pills, they stopped at a liquor store where one of the men bought defendant a bottle of Hennessey. Defendant took an ecstasy pill, and drank Hennessey and smoked marijuana as they drove around Hunter's Point and the Fillmore District.

Defendant could feel that his body was "ready to shut down," and then he passed out in the car. Reed woke him when they were back on Connecticut Street. Defendant was in the back of the car, and Allen and Hayes were gone. Defendant was groggy as Reed shook him awake. Reed said, "Your stupid ass let dude grab the gun and you shot him." Defendant did not know what Reed was talking about. He did not have a gun with him in the car and did not see anyone else in the car with a gun. When defendant asked Reed what he was talking about, Reed told him he had tried to rob somebody and that defendant shot the man when he tried to grab defendant's gun. Reed sounded angry with defendant and ordered him out of the car. Although defendant did not believe he shot anyone, he got out of Reed's car and went to a friend's house to sleep.

Later that day, defendant learned from a television news report that a senator's son had been shot on Mariposa Street. He became concerned because the suspect was described as a young Latino male. A police sketch he saw in a later newscast resembled him in certain ways. Although he did not remember a shooting, he became scared that he might have done it.

When defendant spoke to his mother after his arrest, he was distraught and thought it was possible that he had shot someone and failed to remember it. The information he relayed to his mother came from what Reed had told him. At that time, defendant was afraid and thought he was going to get the death penalty. When he spoke to his mother, he believed that he was the person who killed McPherson but he had no memory in his head of doing it at the time, or when he testified at trial.

---

[2]Defendant had learned from television coverage that the shooting victim was the son of a California state senator.

People v. Terrell, 141 Cal.App.4th 1371, 1373-79 (Cal. Ct. . App. 2006).

## DISCUSSION

**I.     Legal Standard**

    **A.     Standard of Review for State Court Decisions**

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).  It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

        **1.     Section 2254(d)(1)**

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of [] clearly established Federal law, as determined by the Supreme Court of the United States." Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 409 (2000).  While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

5

### a. Clearly Established Federal Law

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. Williams, 529 U.S. at 391. There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S. at 64-65. When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. See id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

### b. "Contrary to"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A "run-of-the-mill state-court decision" that

correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

### c.  "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; accord Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it. Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable standard is not a clear error standard. Andrade, 538 U.S. at 75-76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging the overruling of Van Tran on this point). After Andrade,

> [t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them.

Id. In examining whether the state court decision was unreasonable, the inquiry may require

analysis of the state court's method as well as its result. Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

### 2. Sections 2254(d)(2), 2254(e)(1)

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  An unreasonable determination of the facts occurs where a state court fails to consider and weigh highly probative, relevant evidence, central to a petitioner's claim, that was properly presented and made part of the state court record. Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004). A district court must presume correct any determination of a factual issue made by a state court unless a petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court. See Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004). In Taylor, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1). Id. First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2). Id. at 1000. The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings. Id. Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by dressing the state court finding in a presumption of correctness under § 2254(e)(1). Id. According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error. See 28 U.S.C. § 2254(e)(1). "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference

8

implicit in the 'unreasonable determination' standard of section 2254(d)(2)." Taylor, 366 F.2d at 1000.

### 3. Claims Not Considered in a Reasoned State Court Decision

Where a state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. Himes, 336 F.3d at 853; accord Lambert v. Blodgett, 393 F.3d 943, 970 n.16 (9th Cir. 2004).

## II. Exhaustion

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through state collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987). It is undisputed that Petitioner exhausted his state court remedies on direct appeal as to the sole claim remaining herein.

## III. Legal Claim

Petitioner claims that the trial court violated his constitutional rights by admitting his telephonic statements to his family because these statements were the "fruit" of his earlier confession to the police, which confession was coerced and obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).

Prior to trial, Petitioner moved to suppress all of the tapes and transcripts of his police confession and of his telephone call home. The California Court of Appeal summarized the relevant facts adduced at the suppression hearing, as follows:

9

When defendant was taken to the homicide interview room on November 28, 2001, he could not see any cameras or microphones in the room, and the police did not tell him that his statements would be recorded. He admitted that he had been arrested several times in San Francisco, beginning at age 13. When he had made statements in the past, he could see the tape recorder in front of him.

Defendant had been arrested a few days earlier for violating a court order committing him to a residential drug treatment program. His interview by Inspectors Gordon and Cleary began at 8:45 p.m. on November 28. The inspectors told defendant that their questioning was "nothing to be scared of." Cleary advised of defendant of his Miranda rights. Defendant agreed to let the inspectors talk to him.

Gordon began by questioning defendant about some gang shootings on Potrero Hill. Defendant told the inspectors that he did not want to talk and repeated that position five more times as Gordon continued to pose questions about the gang shootings.

After a few minutes of this, Gordon said, "Let's talk about Mariposa Street." Although the inspectors did not mention that Mariposa Street was the scene of the McPherson shooting, Gordon hinted to defendant a few minutes later that he was being questioned about a homicide, and that this might be his last opportunity to tell his side of the story. After the subject of "Mariposa Street" was raised, defendant stated nine more times that he did not want to talk, and asked to be brought "back upstairs." The inspectors agreed to do so in "a couple [of] minutes," but continued questioning defendant about other subjects before returning to the subject of their investigation. Gordon told defendant that he was in "serious trouble," and that there were "very serious" allegations against him, but that the inspectors could not discuss them with defendant because he had refused to talk. Gordon told defendant they could only discuss the allegations if he said, "I'd like to reopen the conversation." Defendant then stated, "I'd like to reopen the conversation."

The inspectors told defendant that it was alleged he was involved in a homicide and that a "young lad" had identified him as the shooter from a photo. Defendant disclosed to them that he was worried about receiving the death penalty. They urged him to tell the truth and give his side of what happened. Cleary stated, "[O]ur job is just to help with the truth so that we can move forward here." Gordon said they needed the truth so they could "go back to the district attorney - . . . and tell him - . . . something."

Defendant said that he did not want to say anything that's gonna get me in any type of way, or time or nothin'." Gordon responded that defendant was "already in trouble" and that this was the time to "clear it all up." Defendant stated he was ready to speak. He stated: "Man, all I want to know, if I speak, if I was to be convicted of anything, would I get lesser time? Because I don't - if that's the case, I might as well just fight it . . . to the end . . . " Gordon told defendant that he could not "promise [him] anything," but that "What we can do is speak for you to the district attorney, and tell the district attorney how . . . sorry you are. . . . [and] that you cooperated fully with us . . . ."

Gordon told defendant, "[W]e know that you [had] a gun, we know that you took the purse, we know that you asked the guy for his wallet and we know that it went bad . . . . And we know that you didn't mean to pull that trigger, did you?" Defendant responded that he did not mean to pull the trigger, and proceeded to confess to robbing Savelle of her purse, attempting to McPherson of his wallet, and

> accidentally shooting McPherson when he grabbed his gun. The inspectors then elicited more details about the crimes from defendant. Defendant told the inspectors that he was "scared to death" and commented four times that he hoped he would not get the death penalty and did not want to die. Defendant also confessed to his role in the two other robberies that night, and eventually implicated Reed in the crimes, after first claiming that he acted alone in committing the crimes. Defendant asked the inspectors to try to get him a manslaughter charge. He said he could not imagine spending life in prison, but knew "if I didn't come clean, it was gonna haunt me forever." At one point, defendant told the inspectors, "I know I was gonna lose that trial anyway, I just decided to get this off my chest and . . . that is the truth . . . . Shit, this shit is haunting me. I swear to God, this shit is haunting me."
>
> After putting details on a map of the scene of the McPherson shooting at the inspectors' request, defendant stated: "Man, could I call my Mom and tell her I love her today, because I know they said the phones was off. Could I at least do that? Because I know I ain't seeing her for hell o' long. Could I get that at least, please? Please, could I get that? Could I get that?" The inspectors agreed, and brought defendant a telephone for him to use. Defendant admitted at the hearing on his motion to suppress that it was his own idea to make the call to his mother, and that the interviewers did not do anything to suggest that he make such a call.
>
> Defendant began the conversation with his mother as follows: "Momma, man, I love you. C.J. [defendant's nickname]. Man I'm gonna be gone for a while, Momma. Man, please don't stress, please, man, I can't take no more, but I'm gonna be gone for a while, probably get life. Momma, please don't cry, please. Man, the Senator's son. Man, somebody snitched on me. I didn't mean to do it, though. I didn't. He, he tried to grab the gun and I pulled away and it went off, and then the inspectors just came to get me, somebody snitched on me." Defendant repeated the substance of these statements to the three other relatives he spoke with on the phone while in the interview room.

Terrell, 141 Cal.App.4th at 1379-82.

The prosecution did not dispute that Petitioner's confession to the police violated Miranda, but argued that his statements on the telephone to his family were nonetheless admissible. (Reporter's Transcript ("RT"), attached as Resp't. Ex. B, at 48, 99-100.) The trial court found that defendant's statements to police were inadmissible under Miranda because the police continued questioning after Petitioner stated he did not want to talk, and were involuntary in light of Petitioner's age, his concern about the death penalty, and the officers' assurances that they would speak on his behalf to the prosecutor.[3] (RT at 5-6, 103-07.) The trial court admitted the tapes and transcript of Petitioner's statements on the telephone because they were not the product of coercion

---

[3] At the preliminary hearing, the magistrate judge had found that Petitioner's confession to the police violated Miranda but was not involuntary, and that the telephone call was admissible. (Clerk's Transcript ("CT"), Resp't. Ex. A, at 43-44.)

11

or a custodial interrogation. (RT at 103-05.)

The California Court of Appeal found that the telephonic statements were not the "fruit" of the prior unlawful confession to the police because Petitioner's voluntary decision to telephone his family was an "intervening circumstance" that broke the causative chain from the prior confession. Terrell, 141 Cal. App. 4th at 1385. The court went onto find that telephonic statements were neither involuntary nor obtained in violation of Miranda because the coercive conditions of the police interrogation did not still exist when Petitioner made his phone call to his family. Id. at 1386-87. The court based this finding on the facts that Petitioner was no longer in custody or its functional equivalent insofar as he was not talking to the police, the officers did not suggest or attempt to direct the telephone call, Petitioner's family was not acting at the instigation of or on behalf of the police, Petitioner did not have any subjective awareness that his phone call was being recorded by the police, and Petitioner statements to his family were not motivated by any desire for help or leniency from the police. Id.

The state courts reasonably concluded that his telephonic confessions to his friends and family were admissible. Petitioner was not entitled to the protections of Miranda because he was speaking to his family members, not the police or any other government agent. See Arizona v. Mauro, 481 U.S. 520, 528-29 (1987). Moreover, the telephonic statements were not coerced. A coerced confession is one in which, under "the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing Haynes v. Washington, 373 U.S. 503, 513-14 (1963)). The evidence in this case is undisputed that Petitioner voluntarily requested to make the phone call. The police left the room, and Petitioner considered himself to be alone as he did not know the conversation was being recorded. Petitioner testified in the trial court that he alone decided what he would say to his family, and that he spoke to them to comfort and unburden himself, not to obtain any leniency from the police or under fear of any reprisal for his words. These circumstances plainly indicate that the statements were made of his own free will, and were not the product of any pressure, must less

coercion, by the police. See, e.g., Illinois v. Perkins, 496 U.S. 292, 296-97 (1990) (no coercion where suspect speaking to undercover government agent whom suspect did not believe was a government official).

Moreover, the state courts reasonably concluded that telephonic statements were not the product of the prior unlawful confession to the police. As correctly noted by the California Court of Appeal, "[T]his Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." United States v. Bayer, 331 U.S. 532, 540-41 (1947). Here, the evidence is undisputed that the conditions of the police interrogation had been removed. The police officers had left the room. Petitioner himself spontaneously requested to make the phone call. The police were not involved in the discussion, and Petitioner believed that they were not listening. The state courts correctly characterized these acts as intervening occurrences that broke any causal connection between the coercive circumstances of the police interrogation and the circumstances of Petitioner's entirely voluntary telephone call to his family. When speaking to his family, Petitioner did not expect leniency or fear reprisal from the authorities, rather, as he testified, he voluntarily confessed to his family members in order to unburden and comfort himself. Under these circumstances, the state courts could reasonably conclude that Petitioner's voluntary statements to his family members were not the product of or caused by his earlier confession to the police.

Consequently, the state courts' conclusion that the admission of Petitioner's statements on the telephone did not violate his constitutional rights was neither contrary to nor an unreasonable application of federal law. Petitioner is not entitled to habeas relief.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: 8/31/09

*Saundra B Armstrong*
SAUNDRA BROWN ARMSTRONG
United States District Judge

P:\PRO-SE\SBA\HC.06\Hayles6909.denyHC.wpd          13

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFTON JAMES TERRELL JR, | Case Number: CV07-01457 SBA |
| Plaintiff, | **CERTIFICATE OF SERVICE** |
| v. | |
| D.L. RUNNELS et al, | |
| Defendant. / | |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 2, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Clifton J. Terrell V79508
Corcoran State Prison
P.O. Box 3461
Corcoran, CA 93212

Dated: September 2, 2009

    Richard W. Wieking, Clerk
    By: LISA R CLARK, Deputy Clerk

P:\PRO-SE\SBA\HC.06\Hayles6909.denyHC.wpd     14